MORRIS N. MAGIN and JANICE MAGIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Magin v. Commissioner
Docket No. 23927-82.
United States Tax Court
T.C. Memo 1985-304; 1985 Tax Ct. Memo LEXIS 321; 50 T.C.M. (CCH) 208; T.C.M. (RIA) 85304; June 25, 1985. *321 Held, M's purported investment in a videotape tax shelter was a factual sham. The claimed deductions and investment credit based upon the purported videotape investment are denied. Jeffrey A. King, for the petitioners. James W. Clark, for the respondent. NIMS MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency of $20,464 in petitioners' 1977 Federal income tax. The issues for decision are: (1) whether Morris N. Magin and Janice Magin (petitioners) were engaged in a bona fide business activity of television program distribution; (2) if so, whether petitioners' *322 activity constituted an activity engaged in for profit under section 183; [1] (3) if petitioners engaged in the licensing and distribution of the videotape for profit: (a) whether the videotape may be depreciated under the sliding scale method of depreciation; (b) whether petitioners are entitled to deduct $2,000 for legal and professional fees attributable to their distribution of the videotape; and (c) whether petitioners are entitled to a $6,500 investment credit. FINDINGS OF FACT All of the facts in this case have been stipulated subject to numerous qualifications and numerous evidentiary objections by respondent. The stipulation of facts and exhibits attached thereto are incorporated herein to the extent reflected in the following findings of fact. Petitioners Morris N. Magin and Janice Magin, husband and wife, resided at Dix Hills, New York, at the time their petition was filed in this case. Janice Magin is involved in this case only by virtue of having *323 filed a joint return with her husband. Morris Magin is hereinafter sometimes referred to as "petitioner." Petitioner, a self-employed physician, reported a net profit of $71,640 from his medical practice on Schedule C of his 1977 joint Federal income tax return. Petitioner's wife was employed as a clerk in his office and earned $4,000. In addition, petitioners received $7,833 of taxable interest and dividends during 1977. On a second Schedule C attached to their 1977 Federal income tax return, petitioners reported a $41,000 net loss from a business named National Film Production. Petitioners listed the principal business activity and product of National Film Production as TV Production and TV Shows, respectively, and claimed to have owned the business for 12 months in 1977. The $41,000 net loss was comprised of a $39,000 deduction for depreciation of property identified as "TV Production" and a $2,000 deduction for legal and professional fees. The $39,000 depreciation deduction was shown on Schedule C-2 as follows: a. Description of property TV Production b. Date acquired    /   /77 [the dates are left blank on Schedule C-2] c. Cost or othe basis *324 65,000 d. Depreciation allowed or allowable in prior years    e. Method of computing depreciation f.Life or rate 10 yrs. g. Depreciation for this year 39,000 On Form 3468 attached to their income tax return, petitioners computed a tentative investment credit of $6,500, presumably based on their purported purchase of the videotape. Petitioners, however, were only able to utilize $3,049 of the investment credit since that amount offset the entire Federal income tax they owed for 1977. Petitioners received no income in the years 1977, 1978, 1979, 1980, 1981, 1982 and 1983 from the distribution of the television videotape series "Peter Lupus' Body Shop." The "Peter Lupus' Body Shop" television series consists of 130 half-hour programs or 260 15-minute programs which are purchased as 20-minute videotape cassettes. OPINION Petitioner, a physician, netted in excess of $70,000 from his medical practice during 1977, the taxable yeat at issue in the instant case. Sometime in 1977 he purportedly purchased a 15-minute segment of a 30-minute segment of a television series entitled "Peter Lupus' Body Shop." Petitioner then allegedly entered into a distribution *325 agreement licensing the videotape to Film Syndicators, Inc. On their 1977 Federal income tax return, petitioners deducted depreciation of $39,000 and legal and professional fees of $2,000 based upon Dr. Magin's alleged investment in the videotape, thus offsetting most of the income which he earned from practicing medicine. Petitioners' remaining tax liability was eliminated by a $3,049 investment credit which they claimed for the investment in the videotape. The first issue for decision is whether petitioner was engaged in a bona fide business activity of television program distribution. Resolution of this issue is dependent upon a determination of whether petitioner ever acquired a television program tape. Respondent argues that petitioners' claimed deductions and investment credit with respect to the videotape should be denied because they have not met their burden of proving that Dr. Magin actually acquired the videotape. Alternatively, respondent argues that even if petitioner acquired the videotape, the deductions and investment credit should nonetheless be disallowed because petitioner's television distribution activity was not engaged in with the objective *326 of making a profit under section 183. Finally, respondent contends that the videotape was improperly depreciated under the sliding scale method of depreciation and did not qualify for investment credit as new section 38 property. Petitioners contend that Dr. Magin acquired the videotape and that "the issue is whether or not the activities were engaged in for profit." We disagree. After careful consideration of the entire record, we conclude that petitioners have failed to meet their burden of proving that Dr. Magin actually acquired the videotape. Rule 142(a). Accordingly, we hold petitioner was not engaged in a bona fide business activity and therefore not entitled to any deductions. Under Rule 142(a), petitioners bear the burden of proof in this case, since none of the exceptions provided in the Rule are applicable. At trial, no witnesses appeared or testified on behalf of either party. The trial consisted solely of a showing of the videotape that petitioner purportedly acquired. Dr. Magin's failure to appear at trial and present his own testimony to support petitioners' contentions permits us to draw the inference that Dr. Magin's testimony would not support petitioners' *327 position. . Petitioners' case fails at the very threshold because they have abundantly failed to show that Dr. Magin was in any way connected by ownership to the asset petitioners seek to utilize as a tax shelter. As stated, Dr. Magin did not testify at the trial of this case. Petitioners' counsel represented in a pretrial motion that the promoter, one Conrad Frank, C.L.U., declined to testify voluntarily, and petitioners did not summon him to testify by subpoena. The stipulated material (to most of which respondent took strong exception at trial and on brief) consists essentially of material relating to the production and general attempts to market the entire TV series entitled "Peter Lupus' Body Shop." Petitioners also offered incomplete documents related to Dr. Magin's purported investment in a segment of the videotape series and his purported licensing of distribution rights to the segment. None of the material relating to the production and Marketing of the entire TV series contains any references to Dr. Magin. [2]
*328 The parties did not stipulate and petitioner did not offer any evidence, documentary or otherwise, as to any cash payments which might have been made by Dr. Magin although the Purchase Agreement, hereinafter discussed, calls for a cash payment of $13,000 to be made by certified or cashier's check. The incomplete documents which purport to establish Dr. Magin's investment are as follows: 1. Purchase Agreement. This undated document, consisting of eight pages, purports to set out the terms by which the buyer acquires a "Film Program" for $65,000 -- $13,000 in cash and an additional $52,000 payable on some unspecified future date, with eight percent interest. This document bears only a signature which may well be Dr. Magin's, although its authenticity has not been established. There are no other signatures on this two-party form of agreement. If there is an actual seller, it is not identified. Since the Purchase Agreement is nothing more than an incomplete form, we deem it to be a nullity. It therefore does not establish the fact of any investment by Dr. Magin. 2. Distribution Agreement. This document, dated August 15, 1977, purports to be an agreement *329 between petitioner as Licensor and one "Charles T. Miller of Film Syndicators, Inc., as Licensee," whereby petitioner licenses his "right, title and interest in a Film Program entitled Peter Lupus' Body Shop #56, Robert Carreno" to the Licensee. The document purports to be signed by "Morris Magin." It is no signed by Charles T. Miller or anyone else. Paragraph 7 of the form of Distribution Agreement provides for a 50-50 division of gross receipts between Licensor and Licensee, but also contains the following provision: (c) Half of the fifty per cent (50 %) of the gross receipts (Twenty-five per cent (25 %) of the total gross receipts) credited to the account of Licensor shall be remitted by Licensee directly to       until the sum of       together with interest at the annual rate of eight per cent (8 %), commencing      , owing            by Licensor shall be paid in full. Thereafter Licensor shall receive the full fifty per cent (50 %) of the gross receipts. [All of the blank spaces appear in the document submitted to the Court.] Presumably (c) was intended by the draftsman to be the device by which the deferred obligation to the seller *330 was to be paid, but here, as in the Purchase Agreement, the seller remains an unidentified phantom. Similarly, the terms of payment remain undisclosed. Like the Purchase Agreement, the Distribution Agreement is also hereby held to be a nullity. 3. Risk Factors. At the top of the last page of the five-page undated document entitled "Risk Factors" there is a paragraph which reads as follows: I HAVE READ THE RISK FACTORS STATED ABOVE AND HAVE CONSULTED WITH MY PROFESSIONAL LEGAL, ACCOUNTING AND TAX ADVISORS AND AGREE TO PURCHASE A NEW FILM PROGRAM NOTWITHSTANDING THESE RISKS. Petitioner purportedly also signed this document. Below the space for the investor's (petitioner's) signature is a sentence which reads as follows: I HAVE EXPLAINED TO MY CLIENT THE TAX AND ECONOMIC RISKS CONNECTED WITH THE PURCHASE OF A NEW T. V. FILM PROGRAM. No advisor's name or signature appear. As stated previously, petitioners offered no evidence that any cash was paid by Dr. Magin or that the two-party Purchase and Distribution Agreements were ever fully executed and delivered. For all that appears in the record, Dr. Magin simply signed some blank forms and delivered them to *331 his tax preparer for computation of deductions and credit. From this we can only conclude that petitioners' claim of tax deductions and the investment credit are based on a factual sham, and we so hold. Having done so, we are not required and decline to dignify petitioners' position further by engaging in the academic exercise of deciding the merits of a case based on a factually sham transaction. See . To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. At the hearing respondent objected "to each an every exhibit on the grounds of authenticity, hearsay, relevancy and materiality." We believe it to be a permissible assumption that respondent did not intend to include within this blanket objection such formal documents as petitioners' 1977 return and the deficiency notice, both of which were stipulated. Since we decide this case for respondent, we need not rule on his various evidentiary objections, which we now deem moot.↩